UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>LASHAWN L. WILKS,<br><br>Defendant. | Case No. 19-40085-JPG-18 |

**MEMORANDUM AND ORDER**

This matter comes before the Court on a motion for compassionate release. (Doc. 1007). The movant, LaShawn Wilks, filed his motion on December 14, 2023. Being duly advised in the premises having fully considered the issues and arguments raised, the Court **DENIES** his motion for compassionate release and **FINDS AS MOOT** his motion to withdraw his habeas petition and his motion for status. (Docs. 1064, 1072).

## I. INTRODUCTION

LaShawn Wilks filed this motion for compassionate release on December 14, 2023. In his motion, Wilks argues that there are extraordinary and compelling reasons for compassionate release. He states that one of his minor children, who he purportedly was the primary caretaker for at some point, is now in state custody after being removed from the minor child's grandmother's home for neglect. Wilks also argues that he suffers from medical conditions that warrant his release. He has exhausted administrative remedies.

The Government opposes Wilks's motion. The Government argues that there is no record Wilks was ever a primary caregiver, that he has not paid child support to mothers of his six other children since 2019 or 2020, and that children being placed in foster care is a possible

consequence for conviction—not an extraordinary occurrence warranting compassionate release.

Addressing the medical claims, the Government points out that Wilks has received adequate treatment and medication from the Bureau of Prisons ("BOP"), and that all of the conditions he suffers from have remained the same from when he was sentenced. Even if there were grounds for compassionate release, the Government draws attention to the fact that Wilks has only served eighteen months of a ninety-six month sentence—less than a fifth of his total sentence—and that the § 3553(a) factors weigh against compassionate release.

## II. BACKGROUND

On September 23, 2020, LaShawn Wilks was charged with six drug-related counts in a second superseding indictment (Doc. 318). On December 15, 2021, one of those counts was dismissed. (Doc. 756). On April 20, 2022, Wilks pled guilty to the remaining five counts, (Doc. 825); and on February 7, 2023, was sentenced to a total of ninety-six months in prison—notably, a downward departure from the Guideline range. (Doc. 947). At the time of Wilks's sentencing, he had over a dozen convictions since 2005, and even more arrests. Wilks also had planned a scheme where he and his co-conspirators plotted to start a protest in Centralia, IL, incite a riot, and then—using an arsenal of weapons, including an assault rifle, kept in a basement nearby—target and execute police officers. (Doc. 871).

## III. LEGAL STANDARD

The First Step Act expanded the sentence reduction provisions[1] of § 3582(c)(1)(A) by opening the door for a defendant to move for a reduction rather than only allowing the Director

[1] The reduction provisions are often referred to as "compassionate release" because historically the grounds for reduction have included the defendant's health and/or age as "extraordinary and compelling reasons" for immediate release. Release was called "compassionate" because it was viewed as showing sympathy for an ailing or aged defendant.

of the Bureau of Prisons ("BOP") to so move. First Step Act, § 603(b)(1) (codified at 18 U.S.C. § 3582(c)(1)(A)); *United States v. Gunn*, 980 F.3d 1178, 1179 (7th Cir. 2020). The relevant portion of the law provides:

> **(c) Modification of an imposed term of imprisonment.**—The court may not modify a term of imprisonment once it has been imposed except that—
>
> (1) in any case—
>
> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction. . .
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission. . . .

18 U.S.C. § 3582(c)(1)(A).

In exhausting administrative remedies, the defendant must have asserted the same or similar issues as grounds for relief in his request to the warden as he does in his motion for a sentence reduction. *United States v. Williams*, 987 F.3d 700, 703 (7th Cir. 2021). Otherwise the warden is not equipped to properly consider the defendant's request. Addionally, the Court should give substantial weight to the BOP's analysis, if there is any, regarding "extraordinary and compelling reasons" in any particular case. *Gunn*, 980 F.3d 1180.

The final clause of § 3582(c)(1)(A) requires the Court to consider whether a sentence reduction would be consistent with U.S.S.G. § 1B1.13 (2023) (effective Nov. 1, 2023), the policy statement applicable to motions filed by the BOP Director or the defendant. That policy statement adds the provision that the defendant must not be a danger to the safety of any other

person or to the community. U.S.S.G. § 1B1.13(a)(2).[2] The policy statement further defines "extraordinary and compelling reasons" to include, alone or in combination, as relevant for this case:

> **(1) Medical Circumstances of the Defendant.**—
>
> **(A)** The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end-of-life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
> **(B)** The defendant is—
>
> **(i)** suffering from a serious physical or medical condition,
>
> **(ii)** suffering from a serious functional or cognitive impairment, or
>
> **(iii)** experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
>
> **(C)** The defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death.
>
> **(D)** The defendant presents the following circumstances—
>
> **(i)** the defendant is housed at a correctional facility affected or at imminent risk of being affected by (I) an ongoing outbreak of infectious disease, or (II) an ongoing public health emergency declared by the appropriate federal, state, or local authority;
>
> **(ii)** due to personal health risk factors and custodial status, the defendant is at increased risk of suffering severe medical complications or death as a result of exposure to the ongoing outbreak of infectious disease or the ongoing public health emergency described in clause (i); and
>
> **(iii)** such risk cannot be adequately mitigated in a timely manner.
>
> . . . .
>
> **(3) Family Circumstances of the Defendant.**—
>
> **(A)** The death or incapacitation of the caregiver of the defendant's minor child or the defendant's child who is 18 years of age or older and incapable of self-care because of a mental or physical disability or a medical condition.
>
> . . . .
>
> **(5) Other Reasons.**—The defendant presents any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are similar in gravity to those described in

---

[2] This provision is similar, but not identical, to 18 U.S.C. § 3553(a)(2)(C), which requires the Court to consider the need for the sentence "to protect the public from further crimes of the defendant."

paragraphs (1) through (4).

U.S.S.G. § 1B1.13(b) (2023).

The guideline further states that non-retroactive changes in the law may not be considered in determining whether an extraordinary and compelling reason exists, but it may be considered in determining the extent of a reduction where other extraordinary and compelling reasons exist U.S.S.G. § 1B1.13(c). The guideline also provides that the rehabilitation of the defendant cannot, by itself, be an extraordinary and compelling reason, but it may be considered in connection with other reasons in determining whether and to what extent the Court should grant a reduction. U.S.S.G. § 1B1.13(d).

Thus, for a defendant to be eligible for a § 3582(c)(1)(A) sentence reduction, he must have exhausted his administrative remedies,[3] and the Court must find that (1) extraordinary and compelling reasons for a reduction exist, and (2) considering the applicable factors in 18 U.S.C. § 3553(a), the extraordinary and compelling reasons warrant a reduction. 18 U.S.C. § 3582(c)(1)(A). The movant bears the burden of making such a showing, and the Court has discretion to determine whether the defendant satisfied that burden. *United States v. Newton*, 996 F.3d 485, 488 (7th Cir. 2021); *Gunn*, 980 F.3d at 1180. The Court must ensure that any reduction complies with U.S.S.G. § 1B1.13.

## IV. ANALYSIS

Wilks has exhausted his administrative remedies, therefore, the Court will proceed with analyzing his motion for compassionate release on the merits. He presents two grounds for compassionate release: family circumstances and medical conditions; but he has failed to demonstrate that he qualifies for compassionate release. Even if Wilks were able to present

[3] The exhaustion requirement is not jurisdictional and may be waived by the Government. *Gunn*, 980 F.3d at 1179.

sufficient grounds, the § 3553(a) factors weigh against compassionate release.

### A. Family Circumstances

Wilks states that he is the only available caregiver for his minor child ("I.H."). According to Wilks, until 2018, I.H. was under the care of her maternal grandmother. However, the grandmother struggled with drug addiction and "had her parental rights terminated due to [a] long period of unsatisfactory progress." (Doc. 1007). Moreover, Wilks alleges that the grandmother was indicted for "burns by neglect," and had five other grandchildren removed from her care. (Id.). These events took place in 2018, before Wilks's incarceration. He states that there was an agreement between the grandmother and himself, working with the Illinois Department of Child & Family Services, "to transition [I.H.] into [Wilks's] custody permanently." (Id.). After his arrest and pretrial, Wilks claims that he continued regular visitation. He states that he is the only available caregiver. In a motion to supplement, he presents a letter that validates his claim that I.H. is in DCFS custody—in the care of Lutheran Child & Family Services (LCFS)—and that Wilks had represented to the LCFS that he would like I.H. to live with him. Wilks also states that he has an eight-year-old son who is "exhibiting poor behavior patterns at school that [the child's mother has] been unable to manage effectively" and that "having a live-in sibling factor [between the minor children] will provide [a] positive and effective familial setting." (Id.).

In their response, the Government points out several facts: Wilks has not paid child support for I.H. nor his six other minor children until 2018 or 2019—the time preceding his indictment—there is no indication that Wilks was ever the primary caretaker for any of his children, and that even if I.H. was in foster care, that this "is not an unexpected, unlikely, or unique outcome of [Wilks's] choice to engage in drug trafficking." (Doc. 1023).

As a Court within the District of North Dakota wrote: "Unfortunately, one consequence of incarceration is that the parent/child relationship suffers. The difficulties presented by [the defendant's] incarceration are not extraordinary or compelling but rather a normal consequence of incarceration." (Doc. 1023) (quoting *United States v. Burbidge*, 2019 WL 4863481, at *4 (D.N.D. Oct. 2, 2019)). The Court agrees with the Government; while foster care is unideal, it is not an extraordinary or compelling occurrence warranting compassionate release.

Furthermore, while parents of minors have a responsibility to care for their children, that responsibility cannot be used as a shield to protect a defendant from the natural consequences of their criminal conduct. Even taking Wilks's account as true—that he was indeed close to assuming full custody of I.H.—that is all the more reason Wilks should have steered away from criminal conduct. The Court does not doubt the sincerity of Wilks's desire to care for I.H., but Wilks cannot use that fatherly desire to excuse his criminal conduct.

Moreover, the circumstances that have led to I.H. being in foster care existed *before* Wilks was indicted, let alone sentenced. Compassionate release for family circumstances require some form of change in those circumstances. Had I.H. been removed from her maternal grandmother's custody recently, that would be more persuasive—but she was not. These circumstances were the same today as they were eighteen months ago.

Additionally, Wilks's own motion states that he plans to stay with a family member in Georgia, but that he has alternative home plans with his sister in Mt. Vernon, IL; a sister and aunt in Centralia, IL; as well as a sister and aunt in Paducah; or alternatively, that he could move to Arizona and live with the mother of his fourth daughter. Foster care is certainly not ideal, but I.H. is being adequately cared for currently, and there is no shortage of immediate family, both nearby and in other parts of the country, that could plausibly care for I.H. if they wished to

petition for custody. Therefore, Wilks is not the only available caregiver.

Yet, even were the Court to grant Wilks's request, it is unclear how Wilks would care for I.H. Wilks mentions his housing plans and options and that he plans to "obtain his commercial driver's license and to pursue a full career in commercial driving business," (Doc. 1007), in addition to finishing an associate's degree, to be followed by a bachelor's degree. While Wilks's career and educational ambitions are commendable, the Court does not believe that Wilks is fully aware of all that would entail.

As the primary caretaker of I.H., Wilks would be responsible for ensuring she is safe, has housing, and has her basic needs met. However, were Wilks to be released now, he would be entirely dependent on a third-party for housing and necessities until Wilks finds a job and acquires housing. That places I.H. in a position where she may lack the care, housing, and food security she receives from foster care. But, even if Wilks obtains that commercial driver's license and can adequately provide for her; Wilks will likely be required to complete long drives, perhaps over multiple days. It is unlikely I.H. would be able to accompany him. She must also remain in school. Thus, to continue with his proposed career path, Wilks would need to find a caretaker for I.H. while he is absent—meaning he will have to depend on a third party to be the primary caretaker for I.H. This, on top of the fact that Wilks will likely be required to pay child support for his remaining six children. Therefore, the Court finds Wilks's argument and plan to be I.H.'s primary caretaker to be ultimately unpersuasive.

Turning to the claims regarding Wilks's son, the Court will not opine on whether I.H. and her half-brother living together would be beneficial, her half-brother has a primary caretaker already. Even presuming *arguendo* that it would be beneficial to all involved, that is not the standard for evaluating motions for compassionate release.

For all these reasons, Wilks has failed to show that family circumstances here warrant compassionate release.

**B. Medical Circumstances**

Wilks also alleges that he suffers from "at least six medical conditions, some more severe than others," that warrant his release. (Doc. 1007). However, none of these conditions rise to the level required for a compassionate release based on medical circumstances. Not only are none of them terminal, nor do they substantially interfere with his ability to self-care, the BOP has provided him with medical care. While Wilks alleges that medical care has been inadequate, that is a matter that is best raised in a civil rights action for inadequate medical care, not in a motion for compassionate release.

Additionally, each of the conditions Wilks presents were known to the Court at his sentencing, and, as the Government points out, Wilks "also knew of his medical conditions at [the] time of his change of plea and sentencing." (Doc. 1023). His condition has not substantially worsened nor has he developed any new conditions.

For all these reasons, Wilks fails to qualify for compassionate release on the basis of medical circumstances.

**C. § 3553(a) Factors**

The § 3553(a) factors heavily weigh against Wilks. Not only does he have a significant criminal history, Wilks has served less than a fifth of his sentence—a sentence that was a downward departure from the Guidelines.

Moreover, Wilks has failed to demonstrate that he would not be a danger to the community. According to Wilks's presentence investigation report, He posted a photo on Facebook of him wearing a shirt he handwrote "I do not come in peace [expletive] the police,"

holding a sign, also handwritten, saying "Kill EM With Kindness the same brand of gun they kill us with," with an "X" placed over the word "kindness." Though concerning, it would be one thing if this were confined solely to words, but Wilks's PSR shows that he discussed, planned, and acquired the means to start a riot in Centralia, IL. Not only did Wilks plot to incite violence and destruction in his own community; he planned to use an underground arsenal of firearms to target and murder police officers.

It is difficult to envision a greater danger to a community than a would-be insurgent who planned, and acquired the means, to terrorize his community by inciting a riot, and executing peace officers. Such conduct, bordering on a terroristic plot, are anathema to a safe and civil community. Wilks does not explain why this attempted insurgency is not reflective of his current danger to the community if released. There is no indication that his views have changed.

Thus, even if Wilks had established grounds for compassionate release, the § 3553(a) factors here strongly weigh against his early release.

## V. CONCLUSION

As Wilks has failed to demonstrate sufficient grounds for compassionate release based on family or medical circumstances, and the § 3553(a) factors weigh heavily against release; the Court hereby **DENIES** Wilk's motion for compassionate release. (Doc. 1007).

As Wilk's motion to withdraw his habeas petition remains pending in this case, (Doc. 1064), despite his habeas petition having been withdrawn, (Case No. 3:23-cv-02556-JPG, Doc. 26), and Wilks has moved for the status of the present motion, (Doc. 1072), the Court **FINDS AS MOOT** both motions.

**IT IS SO ORDERED.**
**DATED: September 5, 2024**

*s/ J. Phil Gilbert*
**J. PHIL GILBERT**
**DISTRICT JUDGE**